UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **TEMPLE BAPTIST CHURCH OF RUSTON, INC.** | **CIV. ACTION NO. 3:21-04324** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **EMPLOYERS MUTUAL CASUALTY CO.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**REPORT AND RECOMMENDATION**

Before the undersigned Magistrate Judge, on reference from the District Court, are two motions: 1) a motion to appoint impartial umpire [doc. # 18] filed by Plaintiff Temple Baptist Church of Ruston, Louisiana, Inc. ("Temple Baptist"); and 2) a compound motion to disqualify Plaintiff's appraiser, remedy Plaintiff's interference, appoint an appropriate umpire, and vacate or adjust deadlines [doc. # 21] filed by Defendant Employers Mutual Casualty Company ("EMC"). The motions are opposed. For reasons explained below, it is recommended that Plaintiff's motion be GRANTED and that Defendant's motion be GRANTED IN PART and DENIED IN PART.

**Background**

**I. The Lawsuit**

Temple Baptist commenced the instant litigation on November 24, 2021, when it filed a petition to compel appraisal in the Third Judicial District Court for the Parish of Lincoln, State of Louisiana. (Petition [doc. #1-2]). Temple Baptist alleged that the action stemmed from damage incurred by several of its Ruston, Louisiana properties when Hurricane Laura made landfall on August 27, 2020. *Id*. At all relevant times, the properties were insured by EMC under Policy Number 452-30-51 (the "Policy"). *Id*. The Policy includes an appraisal process

that either party may invoke to resolve disputes regarding loss valuation. *Id*. According to Temple Baptist, EMC refused to meaningfully participate in the appraisal process. *Id*. Therefore, Temple Baptist sought court intervention to declare its rights under the Policy as it related to the appraisal, and to impose deadlines for completion of the process. *Id*.

On December 16, 2021, EMC removed the case to federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332. (Notice of Removal [doc. #1]). On April 20, 2022, Temple Baptist filed an amended complaint to assert claims associated with EMC's failure to timely and adequately compensate Temple Baptist for its losses, which it estimated to total approximately $4.4 million. (Amend. Compl. [doc. # 13]). Specifically, Temple Baptist asserted claims for breach of contract, and for bad faith administration of the claim and for failure to tender adequate payment after receipt of satisfactory proof of loss under Louisiana Revised Statutes §§ 22:1892 and 1973. *Id*. Besides the penalties, fees, and costs, Temple Baptist also seeks an award for diminution of the value of the property; actual repair costs; reimbursement for personal repairs at the property; actual costs related to personal property manipulation, cleaning, repair, and/or replacement; additional living expenses; and mental anguish. *Id*.

On April 20, 2022, the court issued a scheduling order that set the matter for trial on April 10, 2023. (Sched. Order [doc. # 14]).

**II.    The Present Dispute**

The Policy includes an appraisal provision, which states that if the insurer and insured do not agree on the amount of the loss or the valued of the covered party, then either party may demand that the amounts be determined by appraisal. *See* Policy, pg. 29; M/Appt. Umpire, Exh. A [doc. # 18-2]). Once a written demand for appraisal is made, then the insured and the insurer each select an appraiser who, in turn, selects a competent, impartial umpire. *Id*.

On May 19, 2021, Temple Baptist notified EMC, in writing, that it was invoking the appraisal clause and had selected Adam Posan as its appraiser. (Affidavit of Alexis Mallet, Jr. and May 19, 2021 Letter; M/Disqualify, Exhs A and A(1) [doc. # 21-2]).

On May 20, 2021, EMC appointed Alexis Mallet, Jr., as its appraiser. (Affidavit of A. Mallet, Jr.).

Mallet received Temple Baptist's estimate of damages from Posan on June 14, 2021. *Id*.

On June 30, 2021, pursuant to Mallet's suggestion, Posan and Mallet agreed to appoint Bree McCorkle as umpire (hereinafter sometimes referred to as, "Umpire McCorkle"). (Mallet Affidavit and June 30, 2021 email exchange; M/Disqualify, Exhs A and A(2) [doc. # 21-2]).[1]

On December 7 and 15, 2021, Mallet sent his estimate and related reports to Posan and Umpire McCorkle. (Mallet Affidavit [doc. #21-2]).

On February 7, 2022, Posan provided his report to Umpire McCorkle and Mallet. *Id*. On February 13, 2022, Mallet provided his position paper to Umpire McCorkle and Posan. *Id*.

On February 15, 2022, Umpire McCorkle, accompanied by Mallet and Posan, conducted an on-site inspection of the property. *Id*. During the inspection, Umpire McCorkle questioned Posan about alleged damage to windows and why the entire roof system needed to be replaced. *Id*.

By March 17, 2022, Mallet assessed that the matter was ripe for decision by Umpire McCorkle. *Id*.

During this same timeframe, Umpire McCorkle also was serving as umpire in another matter where Mallet was the appraiser for EMC, Kevin Donlon was the designated appraiser for

---

[1] Apparently, on April 23, 2021, Mallet and Posan had agreed to use Bree McCorkle as umpire in another matter. *See* April 23, 2021 email from A. Posan to A. Mallet; M/Disqualify Exh. A(3).

the insured, Industrial Packaging Corp. ("Industrial Packaging"), and Jason Smith (who also represents Temple Baptist) was attorney for Industrial Packaging. *See* March 9, 2022 email from J. Smith to B. McCorkle; M/Disqualify Exh. A(17 [doc. #21-2]).

On March 9, 2022, Mr. Smith sent an email to Umpire McCorkle in the Industrial Packaging matter wherein he stated that it had been brought to his law firm's attention by their "client's appraiser" that McCorkle was the agreed umpire not only the Industrial Packaging claim, but on numerous other claims involving Al Mallet as the designated appraiser for EMC. *Id*. The undisclosed appraiser had informed Mr. Smith's firm that recent umpire awards in one or more of these other claims had contravened clearly applicable local/state building codes and were best classified as "non-insurance solutions." *Id*. According to Smith, the foregoing practices raised more than a suspicion of mistake and/or impropriety in the appraisal process. *Id*. Furthermore, the law firm's "client's appraiser" stated that the same concerns appeared to be manifesting themselves in the Industrial Packaging matter. *Id*. Consequently, if Umpire McCorkle did not recuse himself within the next five days from the Industrial Packaging matter, then Smith's firm intended to sue him and the insurance carrier for potential bias, amongst other things. *Id*. As part of the lawsuit, Mr. Smith threatened to seek extensive discovery, including court sequestration of Umpire McCorkle's (and Mallet's) cell phones, plus Umpire McCorkle's personal and business computers. *Id*.

Umpire McCorkle did not see Mr. Smith's March 9 email until March 15, 2022. (March 15, 2022 email from B. McCorkle to K. Donlon and A. Mallet; M/Disqualify Exh. A(17) [doc. #21-2]). One hour later, Industrial Packaging's appraiser, Kevin Donlon emailed Umpire McCorkle and Mallet, and stated that, "[t]his file has gotten weird, I've been asked to bill for my hours and excuse myself. So that is all I am going to do . . ." (March 15, 2022 email from K.

4

Donlon to B. McCorkle, et al.; M/Disqualify, Exh. A(18) [doc. #21-2].

On March 20, 2022, Mallet sent an email to Smith and Umpire McCorkle in the Industrial Packaging case regarding the "interference with this appraisal." (March 20, 2022 email from A. Mallet to B. McCorkle, et al.; M/Disqualify, Exh. A(19) [doc. #21-2]). He noted, *inter alia*, that Posan was the original appraiser for Industrial Packaging before he recused himself and that Kevin Donlon had replaced Posan. *Id*. When Donlon replaced Posan, Mallet asked Donlon whether he wanted to continue with McCorkle as the umpire in that matter. *Id*. Donlon had agreed. *Id*. Mallet added that Donlon had quit as Industrial Packaging's appraiser and that Industrial Packaging could appoint another appraiser. *Id*.

On March 20, 2022, Umpire McCorkle sent an email to Mr. Smith in the Industrial Packaging matter and stated that, "[t]he appraisers chose me as the umpire. If they both want me to continue as the umpire I will continue. If they want to change the umpire they can do that too." (March 20, 2022 email from McCorkle to J. Smith; M/Disqualify, Exh. A(19) [doc. #21-2]).

Meanwhile, Posan and Mallet also were serving as appraisers on yet another separate claim where McCorkle was the umpire. (Posan Affidavit; Pl. Response to M/Disqualify, Exh. 1 [doc. # 27-1]). In that undisclosed claim, Mallet inexplicably refused to authorize allowances for necessary code upgrades. *Id*. Moreover, Umpire McCorkle, despite having all of the documentation showing the need for the code upgrades, inexplicably rendered an award that excluded the upgrades. *Id*. As a result, Posan came to believe either that 1) Mallet and McCorkle had developed "some undisclosed relationship" that would adversely affect the appraisal award in the present case; or 2) Umpire McCorkle was not experienced or qualified enough to umpire such a large commercial loss as the one at issue in this case. *Id*. In addition,

5

Posan suspected that Mallet and Umpire McCorkle were communicating with each other regarding the claim without Posan's knowledge or participation. *Id*.

As a result of his suspicions, Posan decided that he no longer was willing serve as an appraiser in the instant matter, and, on March 22, 2022, emailed Umpire McCorkle and Mallet to notify them that he was voluntarily removing himself from the Temple Baptist file and the panel. *Id*. Posan stated that he independently made this decision on his own accord and that no one had advised or suggested in any way that he withdraw as appraiser. *Id*.

Less than two hours after Posan independently and voluntarily removed himself from the Temple Baptist file, Smith, on behalf of his client Temple Baptist, named Richard Collins as appraiser in Posan's stead. (March 22, 2022, email from J. Smith to E. Shawler; M/Disqualify, Exh. A(21) [doc. #21-2]).

On March 24, 2022, Temple Baptist's new appraiser, Richard Collins ("Collins"), sent an email to Mallet and Umpire McCorkle advising them that he had not received any documents and had not inspected anything yet. (March 24, 2022 email from R. Collins to A. Mallet, et al.; M/Disqualify, Exh. A(24) [doc. #21-2]). He also stated that, as a panel, they needed to discuss "the multitude of appraisals that [he was] named on for [McCorkle] and see if we as panel [sic] feel like the current caseload may cause a conflict"? *Id*.

On April 1, 2022, Collins, Mallet, and Umpire McCorkle had a conference wherein Collins reiterated that he had not received any data on the claim/appraisal from the attorney. (Mallet Affidavit [doc. #21-2]). Umpire McCorkle discussed conflicts with Collins because the two of them had other appraisals together where Collins was the umpire in at least one and McCorkle was the appraiser. *Id*.

On April 11, 2022, Umpire McCorkle emailed Collins and asked him whether he had

made a decision as to whether he would go forward as appraiser.  *Id*.

On an unspecified date, Mallet emailed Collins and Umpire McCorkle and advised them that, in his opinion, Collins should resign, not McCorkle, because there was no conflict until Collins came aboard.  *Id*.

According to Collins, before he agreed to handle the claim for Temple Baptist, Umpire McCorkle had mentioned to him that he would be withdrawing as umpire.  (Affidavit of Richard Collins; Pl. Response to M/Disqualify, Exh. 2 [doc. # 27-2]).  Umpire McCorkle also told Collins that he had received some prior correspondence from a "church pastor of Temple Baptist," which, in Collins' opinion, was the main reason that McCorkle intended to withdraw as umpire.  *Id*.

On May 26, 2022, McCorkle removed himself as umpire in the instant matter.  *Id*.  According to Mallet, McCorkle removed himself as umpire because of his conflicts with Collins. (Mallet Affidavit [doc. #21-2]).

On July 13, 2022, Temple Baptist filed the instant motion to appoint impartial umpire. Temple Baptist acknowledged that this was the second time that the parties were selecting an umpire, a circumstance that it characterized as unfortunate, frustrating, and which it argued was further evidence of EMC's delay tactics.  In support of its motion, Temple Baptist nominated Cade Cole, John Robison, or Carl Martin as potential umpires.

On August 3, 2022, EMC filed the instant motion:  1) to disqualify Temple Baptist's appraiser, 2) to remedy Temple Baptist's interference by (a) prohibiting appointment of another appraiser; (b) rejecting Temple Baptist's proposed umpires and reappointing McCorkle, or if he declined to participate, Sam Amoroso or Timothy Marshall; and (c) prohibiting further *ex parte* communication with the new umpire; and 3) to vacate or adjust scheduling deadlines pending the

7

umpire award.

On August 4, 2022, EMC filed its memorandum in opposition to Temple Baptist's motion to appoint umpire. [doc. # 27].

On August 24, 2022, Temple Baptist filed its memorandum in response to EMC's compound motion and its reply brief in support of its motion to appoint umpire. [doc. #s 27-28, 32-33].

EMC filed its reply in support of its compound motion on August 30, 2022. [doc. # 35]. Accordingly, the matter is ripe.

### **Standard of Review**

The parties do not tie their motions to any particular procedural vehicle under the Federal Rules of Civil Procedure. From what the undersigned may discern, the motions may be best characterized as seeking injunctive or declaratory relief under the terms of the Policy. A motion for preliminary injunctive relief requires the movant to show (1) substantial likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of a preliminary injunction, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *See Benisek v. Lamone*, ___ U.S. ___; 138 S.Ct. 1942, 1943–44 (2018); *Partners in Nutrition v. Minnesota Dep't of Educ.*, Civ. Action No. 22-2195, 2022 WL 5114461, at *3 (D. Minn. Oct. 4, 2022). Furthermore, a preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24; 129 S.Ct. 365 (2008).

Moreover, the Declaratory Judgment Act, 28 U.S.C. § 2201[2] does not contemplate

---

[2] Upon the filing of an appropriate pleading within its jurisdiction, a court of the United States may declare the rights and other relations of any interested party seeking such declaration, whether or not further relief is or could be sought. 28 U.S.C. § 2201.

"motions" for declaratory relief. *Veranda Gardens, LLC v. Secura Ins.*, Civ. Action No. 18-0611, 2019 WL 2438788, at *2 (W.D. Ky. June 11, 2019). Accordingly, courts often treat "motions" for declaratory relief as motions for partial summary judgment. *See Veranda Gardens,* 2019 WL 2438788 (and cases cited therein); *Hernandez v. Office of Comm'r of Baseball*, Civ. Action No. 18-9035, 2019 WL 5593056, at *1 (S.D.N.Y. Oct. 30, 2019) (because plaintiff already has asserted this claim for declaratory relief in the operative complaint, the motion is essentially one for partial summary judgment). Of course, summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When a movant bears the burden of proof on an issue, it must affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, 14 F.3d 52, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

## Analysis

I. **The Policy Appraisal Provision**

The parties' dispute derives from the following provision of the Policy:

If "you" and "we do not agree on the amount of the loss or the value of covered property, either party may demand that these amounts be determined by appraisal.

If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand. The two appraisers will then select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court of record in the state where the property is located to select an umpire.

The appraisers will then determine and state separately the amount of each loss. The appraisers will also determine the value of covered property items at the time of the loss, if requested.

If the appraisers submit a written report of any agreement to "us", the amount

9

agreed upon will be the amount of the loss. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. Written agreement so itemized and signed by any two of these three sets the amount of the loss.

Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be paid equally by "you" and "us."

(Policy, pg. 29; M/Appt. Umpire, Exh. A [doc. # 18-2]).

## II. Law

"Under Louisiana law,[3] an insurance policy is a contract between the parties and is construed under the same general rules for interpreting contracts." *Cent. Crude, Inc. v. Liberty Mut. Ins. Co.*, ___ F.4th ___, 2022 WL 14782529, at *2 (5th Cir. Oct. 26, 2022) (citation omitted). Moreover, "an insurance policy is a contract between the parties and is construed under the same general rules for interpreting contracts." *Id*. (citation omitted). The following principles of contract interpretation guide the court's inquiry:

- "Interpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE ART. 2045.

- "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ART. 2046.

- "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE ART. 2050.

- "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." LA. CIV. CODE ART. 2053.

---

[3] A federal court sitting in diversity applies the substantive law of the forum state. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citation omitted).

- "When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." LA. CIV. CODE ART. 2054.

- "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." LA. CIV. CODE ART. 2055.

- "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." LA. CIV. CODE ART. 2056.

The Louisiana Supreme Court has held that insurance policy provisions requiring the insured to submit the amount of its loss to private appraisal are valid but must be strictly construed because they "somewhat" derogate from the insured's right to have its dispute determined by the courts. *Branch v. Springfield Fire & Marine Ins. Co. of Springfield, Mass.*, 198 La. 720, 728–29; 4 So.2d 806, 809 (La. 1941).

### III.   Discussion

EMC sets forth three reasons to support its argument that the court should disqualify Temple Baptist's new appraiser, Collins. First, EMC asserts that Collins does not appear to qualify as an appraiser under Louisiana Revised Statute § 22:1807.1, which provides that no person should act or hold himself out to be an appraiser "in accordance with the provisions of R.S. 22:1311(F)(2) unless such person is registered with the commissioner of insurance as an appraiser." LA. R.S. § 22:1807.1(A). However, R.S. 22:1311(F)(2) pertains to fire insurance contracts. In any event, each appraiser may register by paying a fee and completing a form

11

provided by the Commissioner of Insurance. LA. R.S. § 1807.1(B). In response to EMC's motion, Temple Baptist adduced evidence to show that Collins is a licensed appraiser in the State of Louisiana. *See* Collins Affidavit; Pl. Response to M/Disqualify [doc. # 16-2]. Moreover, there is evidence that Collins is well-qualified for his role as appraiser. *Id*.

EMC also seeks to disqualify Collins because of EMC's not-unfounded suspicion that Temple Baptist fired its original appraiser and hired Collins in an ultimately successful attempt to orchestrate Umpire McCorkle's removal from the case before he could render an opinion. However, Temple Baptist adduced evidence that Posan resigned of his own accord and that Collins never notified Temple Baptist's out-of-state counsel that he had any open claims with McCorkle before counsel solicited his services as appraiser.[4]

Moreover, Temple Baptist's alleged misconduct is not barred *per se* by the Policy appraisal provision. There also is evidence from the Industrial Packaging case that an appraiser is permitted to resign, whereupon the insured may appoint a new appraiser. In the Industrial Packaging case, Mallet asked the new appraiser whether he wanted to continue with McCorkle as umpire. In other words, there is evidence that industry practice permits a party to name a new appraiser and then for the new appraiser to have input into whether the previously agreed-upon umpire should remain. Of course, the present case arguably is distinguishable where the appraisal process was close to completion when EMC's appraiser resigned.

Ultimately, EMC's position is reduced to the argument that Temple Baptist failed to perform its obligation under the appraisal provision in good faith. *Whitney Bank v. SMI*

---

[4] According to Collins, it was out-of-state counsel, not Mr. Smith, who approached him about serving as appraiser, and he did not disclose his open claims with McCorkle prior to speaking with counsel. [doc. #16-2].

*Companies Glob., Inc.*, 949 F.3d 196, 210 (5th Cir. 2020) (Louisiana recognizes an implied covenant of good faith and fair dealing in every contract); LA. CIV. CODE ART. 1759 ("Good faith shall govern the conduct of the obligor and the obligee in whatever pertains to the obligation."). However, judicial inquiry into a contracting party's good faith performance of an obligation is "not triggered by the morality of a party's intentions, but is initiated only when the obligee has proven a *failure to perform* an obligation." *Favrot v. Favrot*, 68 So.3d 1099, 1109 (La. App. 4th Cir. 2011). Here, strictly construing the appraisal provision of the form contract against the insurer, EMC has not shown that Temple Baptist's alleged manipulation of the appraisal process violated the terms of the Policy. To be sure, the court shares EMC's concerns about the timing and circumstances of the actions by Temple Baptist and their attorney. However, the court is constrained to find that EMC has not shown a likelihood of success on the merits of this bad faith claim, and, thus, it is not entitled to preliminary injunctive relief.[5]

To redress Temple Baptist's alleged interference, EMC further petitions the court to prohibit Temple Baptist from appointing a new appraiser, which will allow McCorkle to reengage as umpire. However, the court has not disqualified Collins as appraiser. Moreover, after Temple Baptist's counsel's issuance (albeit, in a different matter) of a letter that effectively threatened to shut his practice down, it is unlikely that McCorkle would be willing to reengage as umpire in this matter. Even if he were, Temple Baptist then might have a basis to question his impartiality.

---

[5] EMC alternatively urged the court to disqualify Collins as a matter of judicial (or appraisal) economy. Again, however, no such basis for disqualification appears in the Policy, nor does EMC provide any binding authority to support this equitable remedy.

EMC alternatively asks the court to nominate Sam Amoroso or Timothy Marshall as the umpire for the appraisal process.[6] Although EMC represented that Amoroso's and Marshall's resumés were attached to its motion, the court was unable to find them in the record. Consequently, the court cannot confirm their qualifications.

Temple Baptist proposes the appointment of Cade Cole, John C. Robison, or Carl Martin. As aptly noted by Temple Baptist, courts in this district, including this one, routinely have appointed Cade Cole as deputy special master and recognized him as a "neutral" in Hurricane Laura and Hurricane Delta cases. *See* Civ. Case Mgmt. Order No. 1; Pl. Opp. Memo., Exh. 4 [doc. # 27-4]. The court may take judicial notice of this fact and finds that Mr. Cole is well-qualified for the position of umpire and so selects him to fulfill that role in this case.

If, for whatever reason, Mr. Cole declines to serve as umpire in this matter, then the court selects John C. Robison as umpire. His resumé confirms that he is well-qualified for the position. Moreover, EMC has not interposed any objection to his qualifications.

In its motion, EMC also asks the court to prohibit any further *ex parte* communications with the new umpire. However, EMC provides no authority to support this relief. Insofar as *ex parte* communications may serve to undermine confidence in the new umpire's impartiality, it certainly behooves all parties to refrain from engaging in such conduct.

Finally, EMC seeks relief from the scheduling order pending the umpire award and because of its need to conduct discovery regarding the circumstances of Temple Baptist's conduct. Temple Baptist does not object to a continuance of deadlines pending the umpire's

---

[6] Both sides ultimately petition the court to appoint an umpire, thereby implicitly conceding that the appraisers are at an impasse and that appointment of an umpire is authorized and appropriate.

decision, but does object to the necessity for discovery into its actions that culminated with McCorkle's removal as umpire.

Upon consideration, the court agrees with the parties that the scheduling order must be vacated. The court will also stay the case, including discovery, pending the umpire's decision. Moreover, in light of EMC's failure to establish a cognizable basis to support its claim against Temple Baptist for bad faith administration of the appraisal process, the undersigned is not inclined to permit discovery regarding this issue.

## Conclusion

For the above-assigned reasons,

IT IS RECOMMENDED that the motion to appoint impartial umpire [doc. # 18] filed by Temple Baptist be GRANTED and that Cade Cole (or if he declines, John C. Robison) be appointed as umpire.

IT IS FURTHER RECOMMENDED that Defendant EMC's compound motion to disqualify Plaintiff's appraiser, remedy Plaintiff's interference, appoint an appropriate umpire, and vacate or adjust deadlines [doc. # 21] be GRANTED IN PART, and that the current scheduling order [doc. # 14] be VACATED, and that the matter STAYED, pending the new umpire's decision.[7]

IT IS FURTHER RECOMMENDED that EMC's compound motion [doc. # 21] otherwise be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific,

---

[7] EMC has moved the Court to stay this matter, and, thus, the undersigned has recommended a stay. However, in the interest of judicial economy, the Court may wish to administratively close this matter pending the umpire's decision.

written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 1st day of November, 2022.

_____
KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE